# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION – BAY CITY

IN RE:

                                           Case No. 18-20577-dob

     ROLAND J. BRAGG,                       Chapter 13 Proceeding

                                             Hon. Daniel S. Opperman

             Debtor.

_____/

## OPINION GRANTING IN PART AND DENYING IN PART MOTION OF CHAPTER 13 TRUSTEE FOR SANCTIONS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9011 AND 18 U.S.C. § 1927

### Introduction

Thomas McDonald, the Chapter 13 Trustee ("Trustee"), seeks sanctions against Northland Area Credit Union ("Northland") pursuant to Federal Rule of Bankruptcy Procedure 9011 and 18 U.S.C. § 1927. Northland denies that it has committed any action warranting sanctions. The Court heard oral argument on September 25, 2019 and took this matter under advisement. For the reasons stated in this Opinion, the Court grants in part and denies in part the Trustee's motion.

### Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

### Findings of Fact

The Debtor filed a petition with this Court seeking Chapter 13 relief on March 27, 2018 and his Chapter 13 Plan was confirmed on June 15, 2018. Sometime after his petition was filed, the Debtor alleges he received letters from Northland demanding payment of a loan made to him by Northland before he filed his bankruptcy petition. The Trustee learned of this communication

and filed a motion for order to show cause on December 7, 2018 detailing various reasons why Northland should be the subject of a show cause order entered by this Court. Northland responded to this motion and the parties agreed to have the Trustee's motion withdrawn by way of a stipulation and order signed by this Court on January 11, 2019.

On January 30, 2019, the Debtor filed a motion for contempt sanctions against Northland. In this motion, the Debtor alleged the following:

> 8. Northland Area Credit Union was a party to a settlement in the case of *In re Pleiman*, Case No: 17-21892, with the US Trustee in which it agreed to "cease and desist on shutting off ATM or debit card access for NAFCU account holders who file petitions under the U. S. Bankruptcy Code." (See Docket Number 38, paragraph 11, attached as Exhibit A.) Such conduct is a violation of the automatic stay under 11 U.S.C. §362(k).

> 9. On or about June 4, 2018, prior to confirmation in this matter) Debtor's attorney, Rory Dixon Mortimer, was sent a letter from the Credit Union via its attorney, Paul Wenzloff, in which the Debtor was advised that if he persisted in cramming down his auto loan with the Credit Union, the Credit Union may terminate his membership benefits, which includes electronic transfers such as ACH payments and other services. (See Exhibit B attached)

> 10. On November 13, 2018, Northland Area Credit Union wrote the debtor, Roland Bragg, that the credit union will stop all banking services should the bankruptcy cause a loss to the credit union. (See Exhibit C attached)

> 11. At no time did the Credit Union file any objections to Debtor's Plan or his amended Plan relative to the cramdown of the vehicle loan.

> 12. By sending this letter directly to the Debtor's attorney and without filing a proper Objection to Debtor's Plan, the Credit Union attempted to bypass the Chapter 13 process as outlined by the Code and its Rules to the detriment of other creditors who had filed claims in Debtor's case.

> 13. Debtor's Amended Plan was confirmed on June 15, 2018, as originally proposed.

> 14. The November 13, 2018, letter from the Credit Union, this time signed by Bobbie G., a Collections specialist, stated: "We are anticipating the holiday loan will be a loss. In the event of a loss, it will be necessary for us to terminate your account privileges. . . All checking and savings account privileges will need to be stopped as soon as possible including direct deposits, ACH payments, check writing, debit card transactions, overdraft protection, and checking cashing." See Exhibit C attached.

15. The Debtor's holiday loan referenced in the letter above, was included in Debtor's confirmed Plan as an unsecured creditor. The communication by Northland Area Credit Union was to pressure the debtor in paying on the unsecured claim.

16. This holiday loan has a balance as of the date of filing of $628.00

17. No objections were raised by the Credit Union to the treatment of this loan prior to Plan Conformation. In fact, this loan was not even raised in the Credit Union's earlier letter attached as Exhibit B.

18. Debtor makes his Plan payment via an ACH from his Credit Union Account. To date, the Debtor's payments to his plan have all been made and Debtor has not missed a single payment.

19. The claims as filed in Debtor's case reveal that Debtor is paying 91% to unsecured creditors.

20. To date, because the Debtor has not yet completed his plan, he has not caused a loss to the Credit Union.

21. The secured portion of Debtor's GM loan has been paid in full via the Debtor's Plan.

22. That the termination of services of the Debtor disrupts the administration of the Debtor's Plan by threatening the Debtor's income flow into his plan, which in turn may reduce the amount to other creditors of Debtor and which will cause additional work and expense on the part of the Trustee should the termination of ACH services as threatened be applied.

23. That termination of Debtor's membership services is a violation of the Credit Union's agreement with the US Trustee referenced in paragraph 7 above, as well as a violation of the Order Confirming Plan and an attempt to thwart the Debtor's ability to make his plan payment by threatening to discontinue his ACH payments. The termination of Debtor's membership services is an attempt to collect a discharged debt in violation of the stay.

24. Under the Bankruptcy Code, 11 USC§362(k)(10) provides that an individual injured by any willful violation of a stay "stay recover actual damages, including costs and attorney fees, and in appropriate circumstances, may recover punitive damages."

25. When a creditor receives actual notice of the automatic stay, courts must presume that the violation was deliberate. See generally *Fleet Mortgage Group, Inc. v Kaneb, 1999 WL 1006329 (1st. Cir.).* In this case the Credit Union received notice of the Bankruptcy filing by proper services shortly after the bankruptcy was filed on March 27, 2018.

As stated in the motion, two letters were referenced. The first letter, dated June 4, 2018, was sent by Northland's counsel to Debtor's counsel and states:

Dear Mr. Mortimer:

I am writing to you on behalf of Northland Area Federal Credit Union regarding your Chapter 13 bankruptcy client, Roland Bragg. Mr. Bragg had expressed an interest at the 341 hearing in maintaining his membership at Northland Area Federal Credit Union. He stated that he did not want to cause the Credit Union to incur a loss, and he was adamant that the Credit Union would be paid in full. Subsequent to the 341 hearing, your client has amended his bankruptcy plan to cram down the Credit Union's claim secured by the 2009 GMC Sierra pickup truck. I am writing to you to let you and your client know that the cram down will cause the Credit Union to incur a financial loss, and therefore, your client will no longer be eligible for a membership in good standing. Consequently, he may lose membership privileges, such as the ability to incur further debt.

I am letting you know this not to encourage Mr. Bragg from changing his plan, but to inform him so that he is not surprised if he is later denied membership privileges.

. . .

Sincerely,

Karl L. Wenzloff

Likewise, Exhibit C referenced in the Debtor's motion detailed a November 13, 2018 letter from Northland which reads in pertinent part: [1]

Dear Member,

Due to your Bankruptcy filing, it is important you understand our "Member in Good Standing" policy. Please be advised all services will cease to any person that causes a loss to the credit union. We are anticipating the Holiday loan will be a loss. In the event of a loss, it will be necessary for us to terminate your account privileges with Northland Credit Union. All checking and savings account privileges will need to be stopped as soon as possible including direct deposits, ACH payments, check writing, debit card transactions, overdraft protection, and check cashing. Please contact me with any questions at 800-336-2328 Ext. 4254.

---

[1] These exhibits were not attached to the Debtor's motion, but were attached to other pleadings that the Court gleaned for purposes of this Opinion.

Respectfully,

Bobbie G.
Collections Specialist

Northland responded to the Debtor's motion admitting that it received notice of the Debtor's Chapter 13 petition and plan, that it did not object to the Debtor's plan and that the Debtor's plan was confirmed.  More specifically, Northland responded to the Debtor's motion as follows:

> 8. The Credit Union admits that it was a party to a settlement in the case of *In Re Pleiman,* but denies that the Order entered in *Pleiman* prohibits the Credit Union from ceasing to offer member services to members who have caused the Credit Union, or will cause the Credit Union, to incur a loss, as Paragraph 13 of the settlement specifically states that the order is not intended to preclude the Credit Union from shutting off ATM or debit card access for account holders "pursuant to a "Member in Good Standing" policy which would include the termination of the account relationship with the Debtor**."**

> 9. The Credit Union admits that its counsel sent a letter attached as Exhibit B to the Motion to Attorney Rory Mortimer. The letter speaks for itself with respect to its purpose and intent.

> 10. Admit that the Credit Union sent the letter attached to Debtor's motion as Exhibit "C" to the Debtor, Roland Braggs, explaining its member in good standing policy.

> . . .

> 12. Denied for reason that the letter was sent for informational purposes only (as stated in the letter itself) and not to modify or change the Debtor's treatment of the claim.

> . . .

> 14. As stated in the response to Paragraph 10 above, the Credit Union admits that the letter attached as Exhibit C was sent, again advising the Debtor of the Credit Union's "Member in Good Standing" policy.

15. Denied for the reason that there was no reference to the holiday loan in the Chapter 13 Plan filed by the Debtor, and for the further reason that the Credit Union did not file a Proof of Claim with respect to this small unsecured debt.

16. Denied for the reason that the balance owed on the holiday loan was lower than that shown by the Debtor on his schedules and petition in bankruptcy.

. . .

19. Denied for the reason that the creditors will not receive 91% distribution during the course of this 36-month Chapter 13 Plan.

20. Denied for the reason that the Debtor has crammed down the balance owed to the Credit Union on its secured loan, and the Credit Union will further incur a loss on the holiday loan.

21. The Credit Union admits that it has received payments from the Chapter 13 Trustee's office on the secured vehicle loan, but denies that the Trustee has paid to the Credit Union the entire balance which would be owed on that loan per the underlying loan contract, for the reason that the Debtor crammed down the value of the collateral on the vehicle loan.

22. Denied for the reason that the Debtor has had ample opportunity to take whatever action is necessary to ensure that payments continue to go to the Chapter 13 Trustee's office as per the Plan, and for the further reason that the Debtor was specifically advised per the correspondence attached to the Trustee's Motion as early as June 4, 2018 that his membership privileges are subject to termination if he causes the Credit Union to incur a loss pursuant to the Credit Union's "Member in Good Standing" policy.

23. Denied for the reason that the termination of the Debtor's membership services is not a violation of the settlement agreement entered with the U. S. Trustee's office as described in Paragraph 13 of the settlement, and for the further reason that the purpose of communicating with the Debtor, the "Member in Good Standing" policy was to allow the Debtor plenty of opportunity to take whatever action he deemed appropriate should his member services ever be terminated by Northland Area Federal Credit Union. It is further denied that the termination of a Debtor's membership services is a violation of the automatic stay; indeed, courts have widely held to the contrary. See *In re Delores C. Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81 (1988); *In re Veronica T. Spearman v. Commonwealth Credit Union*, Case No. 16-30772, A.P. 16-03010 (Bankr. W.D. Kentucky, March 9, 2017); *In re Bobbitt*, 174 B.R. 548 (Bankr. N.D. Cal 1993); *In re Henry*, 129 B.R. 75 (Bankr. E.D. Va. 1991); *In re Jasper*, 325 B.R. 50 (Bankr. D. Me. 2005).

24. Neither admit nor deny. The law speaks for itself.

. . .

26. Deny for reason that the Debtor has suffered no damages in this matter. The Debtor has continued to have uninterrupted access and use of his account and ATM card at the Credit Union, even after this motion was filed.

After Northland's response, the Trustee concurred with the Debtor's motion and Northland responded to the Trustee's concurrence on February 28, 2019. A few days later, Northland filed a brief and attached to it an account history demonstrating that the Debtor had access to his ATM and share draft account. Given the responses by the parties, the Court set a hearing on March 7, 2019.

At the March 7, 2019 hearing, the Court inquired as to the amount of discovery necessary and the time that would be required for the Court to reserve for an evidentiary hearing. Both the Debtor and the Trustee believed approximately 8 weeks were necessary for discovery given the amount of time allowed to respond to interrogatory and other discovery requests. At this hearing, Northland's counsel stated:

> MR. WENZLOFF: That's all right. I can -- I can speak from here just as easily.
>
> I'm totally puzzled by what I've -- I'm totally puzzled by what I'm hearing. Because the fact is, and I -- and I can't -- I don't understand, none of Mr. Bragg's credit union services have been interrupted or terminated at all. I mean I'm hearing him say well, you know, we're bringing this action because they terminated his services.
>
> I've got, and I -- and I can give it to the Court, I attached just the most recent transaction record to our brief. But I have the transaction record before bankruptcy going right through like yesterday. This man is -- has every member service that any other member has. He's using his ATM card, his -- his debit card, he's -- he's using his checking, his savings account. There has -- there has not been any termination of any services by the credit union.
>
> So I don't understand why -- you know, so it appears to me that -- that -- and I'm totally puzzled I guess I will say as well by sort of the allegations contained in the -- in the motion that Mr. Mortimer filed. He said the credit union violated the <u>Pleiman</u> agreement and it's simply not true. The <u>Pleiman</u> agreement says very

7

clearly in I think it's Paragraph 13 that they're entitled to terminate services for members who cause them to incur a loss.

There will be a loss in this case. The credit union as of this point in time has charged off a part of the vehicle loan, the GMC Sierra truck loan that wouldn't be paid during the term of the plan. And has charged off this small unsecured loan.

He, in his motion, suggests that the credit union somehow should be faulted for not filing an objection to the plan and suggests that we didn't file an objection to the plan in an attempt to bypass the Chapter 13 process as outlined by the Code and its rules to the detriment of other creditors who had filed claims in the case.

I mean 40 years I've been doing this and I have -- I'd have to say this is the first time somebody has suggested that my client ought to be sanctioned for not filing an objection to a plan.

THE COURT: Uh-huh.

MR. WENZLOFF: You know, the -- the cites that the unsecured portion the vehicle -- or the vehicle loan has been paid in full as to what they would get through the plan. The plan didn't pay them 100%.

The credit union a week or two before Mr. Mortimer filed his motion, released its lien on that vehicle which quite frankly they did not have to do. Under 1325 they had every right to say, until your plan has been completed, we're going to leave our lien in place.

So basically here they didn't object to the debtor's plan, they didn't file a proof of claim for a small unsecured claim. They never terminated any services whatsoever for Mr. Bragg and he continues to take advantage of that right to the present day, and they released the lien on this vehicle even though they didn't have to do so.

So I don't see any evidence of any damage to Mr. Bragg whatsoever. I don't see anything that's occurred to him. They sent him a letter. Letters were sent to him, one back in June. So now six months ago saying, by the way, you need to know there's going to be a loss and your client under policy may lose their membership privilege. The letter is attached, speaks for itself.

And then all this time passed from June until November when the credit union sent a letter essentially to the same effect and no one called our office, no one called the credit union and said -- you know, I could understand if somebody called and said, look, we're going to stop the services would you be willing to -- to leave everything in place so he has time to move his account somewhere else for his plan payments and so he has time to ensure he's got his outstanding checks covered.

And the response would have been, yeah, that shouldn't be a problem, let me talk to the credit union. But -- but nobody called or made that request. The credit union has every right to send those letters.

The credit union had -- has the right to terminate services I would submit, but it didn't happen. I'm just saying they had the right to do so.

And so for doing absolutely nothing, I mean improper, they received first a motion from the trustee just out of the blue. And incidentally, I looked at my billing records and I had no communication regarding this file with the credit union from confirmation, if you will, in June until after we received the trustee's motion for show cause.

So it wasn't like any kind of, you know, thing going on with respect to this file in that -- in that regard. They hadn't done anything to this -- this fellow. We told the trustee we didn't think there was any basis in law or fact for his motion and gave him 21 days essentially to -- to withdraw it because we felt it was baseless. And the trustee did in fact withdraw his motion in response to our request that he do so.

And now about two and a half weeks thereafter here comes Mr. Mortimer who files essentially the same motion and puts the credit union, you know, back through now having to respond again and brief it. And, you know, uses terms like emotional and punitive damages are also appropriate in this matter because the actions of the credit union were so egregious.

And I can't even figure out what -- what -- what that would be. Would it be the letter? Is that what they're squawking about, or what? Nothing else was -- there is nothing else here.

And then he submits an order that says he wants an order that the credit union pay $5,000 in violation of the automatic stay and $4,500 in attorney fees. You -- you can be sure when my client got the trustee's motion suggesting that somehow they had violated <u>Pleiman</u>, they were upset about the situation.

And I took off an afternoon and went up to Oscoda and met with the CEO and with the collection manager and went through it and said, I don't think there's anything – I mean I think you have the right to send that letter. That was my -- you know. And we went through it and determined we're going to respond the way that we did. Now they get -- they think that's gone away. The trustee withdraws it.

Now they -- they get Mr. Mortimer coming back with the same allegations. And now they're saying, well, let's have some discovery. And that's going to be, you know, we're talking Oscoda, we're talking about a huge expense for all the parties, but huge expense for the credit union to send me up to Oscoda to take depositions.

9

We've got these legal issues regarding the termination of services, if there's a loss, and the propriety of the letters. I think it would be best in the interest of all parties in an effort to try and save costs here, to have those issues decided by the Court, if you will. Have an opinion from the Court as to whether they had the right to terminate services if -- if there's a loss, they haven't done it here, but maybe that needs to be something that becomes of record here.

I think there needs to be some discussion about the propriety of the letters. And then if we have that out of the way, I don't know where else this -- where else this goes. They haven't -- there's nothing else that has been done by the credit union to Mr. Bragg. There's just nothing else that could give rise to damages because nothing has -- they haven't done anything to this fellow whatsoever.

I mean they didn't object to his plan. They didn't file a claim. And they didn't stop his services. And I don't know if they're -- they're not willing to concede that his services haven't -- I don't know if they're just confused on that point. I don't think so though. We've made it clear on all of our pleadings that that's the case and I have all the records here that I could show to the Court, I can show them to the trustee, I can make copies for Mr. Mortimer, or Mr. Hall.

I don't want to spend the time it's going to take to do discovery when we've got these legal issues that might clearly be dispositive and they're going to have to be decided because they've clearly been erased in the case. I would suggest we do that first.

We've already briefed it quite frankly. I haven't seen their law on it, or their response to it. But let's get those things taken care of because that might very well tell us where this thing is going to go.

In response to Northland's counsel's statements, the Trustee's counsel stated:

MS. ADAMCZYK: Well, Your Honor, it actually goes beyond just those two letters.

THE COURT: Okay.

MS. ADAMCZYK: The bar date in this case was June 28th of 2018 roughly. I'm just guessing at that. It was the end of June.

THE COURT: Right.

MS. ADAMCZYK: In November Mr. Bragg's card was shut off and he went into the credit union and said hey, my card is shut off, what's going on. And he was told in front of a group of everyone in the lobby very loudly, you filed bankruptcy, we're going to turn your card off.

THE COURT: I see.

MS. ADAMCZYK: So and unless you pay your holiday loan, we're not going to turn your card back on. So in November of 2018, Mr. Bragg did pay $628.00 towards his holiday loan as a result of that pressure. That's a violation of the automatic stay.

Additionally, in June as of the bar date, the credit union did not file a claim for that 628.00 day holiday loan. So the loss if any was created, was created when the credit union failed to file a proof of claim.

Because if you look at the case it pays out 91.45% to unsecured creditors. And if we factor in income tax refunds that Mr. Bragg is expected to receive over the next four years, it's actually going to be a near 100% plan.

So if there was any loss, especially on this holiday loan, it was caused by the credit union itself by failing to file that proof of claim. So why should Mr. Bragg be punished for creating a loss that he himself did not create. I mean I believe there is -- there is a concept of law of mitigating your own damages. And if you don't file a proof of claim you can't then complain you've suffered a loss.

So the Debtor's motion transformed on March 7, 2019 such that the Court entered an order opening discovery to allow the parties to explore the issues fully.

As a result, both Northland and the Trustee exchanged discovery requests to explore the issues raised in the Debtor's motion, the Trustee's concurrence, the response of Northland, and the issues raised on March 7, 2019. Of particular note was an answer of the Debtor to an interrogatory of Northland filed with the Court on April 22, 2019:

4.      Did you make any payments directly to Northland Area Federal Credit Union on your holiday loan obligation in response to the letter sent to your attorney dated June 4, 2018, or in response to the letter sent to you by Bobbie G. of Northland Area Federal Credit Union dated November 13, 2018; and if so, please state:

A.      The amount of any payment or payments made by you.
B.      The date on which such payment was made.
C.      The method by which such payment was made, and if by check, please provide the check number and a copy of the check.
D.      The Credit Union location at which such payment was made.
E.      The person to whom you made the payment.

11

ANSWER: Payments were made on the holiday loan post-petition on April 13, 2018 of $64.89; April 27, 2018 of $64.89 and May 30, 2018 of $65.00. All payments were cash and made at the Harrisville Branch of Northland Area Federal Credit Union drive through window. No payments were made after the letter dated June 4, 2018, was received by me through my attorney.

In turn, given the responses to the discovery requests, various motions to compel discovery were filed, as well as a Rule 9011 letter sent by the Trustee to Northland. The Court held a hearing on May 17, 2019 to discern the status of the discovery disputes and then adjourned that hearing to May 30, 2019. At the May 30, 2019 hearing, which lasted approximately 50 minutes, it was disclosed that Northland possibly received $194.78 after the March 27, 2018 petition as disclosed in the Debtor's April 22, 2019 answers to interrogatories. As everyone saw that the nature of this matter changed dramatically again, the Court directed Northland to file a response by June 6, 2019 detailing payments received by Northland either from the Trustee or the Debtor. On June 6, 2019, Northland filed a supplemental response detailing the payments received from the Trustee's office, as well as three payments voluntarily made by the Debtor totaling $194.78. In particular, the response stated:

Dear Mr. McDonald:

Enclosed please find copies of the loan history from commencement through present for Mr. Bragg's 2009 GMC Sierra pick-up truck loan and his holiday loan. It appears that all of the payments on the 2009 GMC Sierra loan received by the Credit Union after the bankruptcy filing in this case on March 27, 2018 came from your office. The holiday loan payment history does reflect the three payments which Mr. Bragg voluntarily made which were discussed when we were in Court last week in the total amount of $194.78.

. . .

Sincerely,

Paul E. Wenzloff

12

As the Court observed on May 30, 2019, the amount in issue was such that the post-petition payment issue could easily be resolved by the payment of $194.78 by Northland.

But that was not to happen so easily. The next day, June 7, 2019, the Trustee filed an adversary proceeding against Northland seeking $194.78. The parties have since resolved their differences in this adversary proceeding, but the instant motion remains. The Trustee's allegations, and the response of Northland, are as follows:

1. The Debtor filed a Motion for Sanctions regarding Northland Area Credit Union's ("the Credit Union") violations of the Automatic Stay in this matter.

Answer: Admit.

2. The Trustee appeared and concurred in this Motion inasmuch as the violations of the Automatic Stay could impede the Debtor's ability to perform his obligations under the Plan in this matter.

Answer: Admit that Trustee filed a concurrence to Debtor's motion. The Credit Union lacks information as to Trustee's motivation.

3. At a hearing on the Motion in this matter on March 7, 2019, the court opened discovery into the violations of the Automatic Stay.

Answer: Admit.

4. The Debtor's Motion contained no allegations against the Trustee, nor has the Trustee been alleged to have committed any violations in this matter.

Answer: Admit that motion contains no allegations against the Trustee.
5. During discovery in this matter, the Credit Union served Interrogatories and Requests for Admissions directed to the Trustee on or about March 25, 2019.

Answer: Admit.

6. The Trustee is not a proper party to the Motion for Violation of the Automatic Stay and therefore is not a relevant party to the discovery related to the Debtor's Motion.

Answer: Deny for reason that it is untrue, and further note that the Trustee submitted discovery requests to the Credit Union, which discovery requests can only be made by a party in an action pursuant to Rules of Federal Procedure.

13

7. Further, the discovery propounded by the Credit Union to the Trustee was not on relevant issues regarding the automatic stay violations alleged by the Debtor.

Answer: Deny for reason that it is untrue.

8. On or about May 6, 2019, at Docket Number 65, the Credit Union filed a Brief which alleged that the Trustee should be compelled to respond to its Discovery requests, even though the Credit Union did not file a Motion to Compel answers to those Discovery Requests.

Answer: Admit that a brief was filed. The Bankruptcy Court scheduled a hearing on the Trustee's objections to the Credit Union's discovery, and the brief was intended to clarify and supplement the Credit Union's requests before the hearing. The Credit Union later filed a motion to compel, attaching the same brief to the motion.

9. Bankruptcy Rule 9011 provides that by signing a pleading a party asserts that to the best of his or her knowledge, information and belief, (1) it is not being presented for any improper purpose, (2) the claims, defenses, and other legal contentions therein are warranted by existing law, or by the establishment of a new law; and (3) the allegations have evidentiary support, or are likely to have evidentiary support after investigation.

Answer: Admit.

10. Bankruptcy Rule 9011 further provides that a party aggrieved by another party violating Rule 9011 may file a Motion for Sanctions under Rule 9011, only after providing a 21-day safe harbor notice to the offending party to withdraw his or her pleading.

Answer: Admit.

11. Such "safe harbor" has been provided to the Credit Union (see Exhibit A).

Answer: Admit that the Trustee sent the letter attached as Exhibit A. Such a "safe harbor" letter would only apply towards the documents that the Trustee actually requested be withdrawn in said letter: Dkt. #65 and the discovery requests.

12. The Credit Union's Discovery and Brief filed at Docket Number 65 are in violation of Bankruptcy Rule 9011 inasmuch as they seek to compel irrelevant discovery from a party who has not been alleged to have committed any wrongdoing under Debtor's Motion for Sanctions.

Answer: Deny for reason that it is untrue. Further state that Bankruptcy Rule 9011(d) states that Rule 9011 does not apply to "discovery requests, responses, objections, and motions that are subject to the provisions of Rules 7026 through

7037". Consequently, Rule 9011 does not apply to the items identified by the Trustee.

13. Furthermore, this Brief and Discovery were served and filed by the Credit Union with full knowledge that it had obtained unlawful post-petition payments in violation of 11 U.S.C. 549 and therefore, was used as means to harass the Trustee, delay the resolution of this matter and enlarge litigation.

Answer: Deny for reason that it is untrue.

14. Instead of merely acknowledging the receipt of these payments at the first hearing in this matter, the Defendant vigorously conducted discovery against the Trustee and caused the Trustee to incur over 20 hours of attorney fees attempting to recover these payments.

Answer: Deny for reason that it is untrue.

15. Because of Defendant's steadfast refusal to acknowledge the payments received post-petition, despite knowing full well these payments were made in violation of 11 U.S.C. §549, the Trustee was forced to bring an Adversary Proceeding for recovery of the payments.

Answer: Deny for reason that it is untrue. In fact, the Credit Union offered to refund the monies received from the Debtor before the Trustee filed his A.P.

16. Upon receiving the Trustee's Complaint, the Defendant merely admitted these payments were made and received.

Answer: Deny for reason that it is untrue.

17. This admission was brought only after the Trustee expended $9,804.00 in attorney fees, representing 26.6 hours of time expended in this matter which could have been avoided if the Defendant had, at the first hearing in this matter back in March 2019, simply acknowledged receipt of the $194.78 and had simply returned the funds without argument. (See Exhibit B attached.)

Answer: Deny for reason that it is untrue.

18. Instead, the Defendant has, up until its Answer to the Complaint, denied it received the payments made, attempted to obtain discovery against the Trustee, and attempted to obfuscate the facts and evidence in its control that it received those payments.

Answer: Deny for reason that it is untrue.

19. As a result of Defendant's admission in its Answer, the Trustee is entitled to sanctions in the amount of $9,804 in costs and attorney fees due to Defendant's obdurate refusal to acknowledge that the payments at issue were made until after this Court had conducted four hearings, the parties conducted discovery and the Trustee had to file this Adversary Proceeding.

Answer: Deny for reason that it is untrue.

In support of his request for fees and costs, the Trustee attached a summary of attorney time as follows:

| Date | Description | Marilyn Hours | Tom Hours |
|------|-------------|---------------|-----------|
| 2/22/2019 | Review & Discuss Debtor's Motion For Stay Violation Prepare and file an Appearance and Concurrence | 1.00 | 0.50 |
| 2/28/2019 | Review & Discuss Responses to Concurrence | 0.25 | 0.25 |
| 3/1/2019 | Review and evaluate Atty Wenzloff's Brief | 0.25 | 0.25 |
| 3/7/2019 | Attend and participate in Court Hearing | 1.25 | 1.25 |
| 3/11/2019 | Review Court Order establishing deadline and note calendar | 0.25 | 0.10 |
| 3/25/2019 | Review and discuss Discovery requests served on Trustee and Debtor | 0.50 | 0.50 |
| 3/29/2019 | Prepare draft of Discovery Requests to be served upon Credit Union | 2.00 | 0.50 |
| 4/19/2019 | Prepare Answers to respond to Credit Union Discovery Request served on Trustee | 1.50 | 0.40 |
| 4/22/2019 | Review and analyze Debtor's Response to Credit Union Discovery Requests | 0.75 | 0.25 |
| 4/29/2019 | Prepare and file Supplemental Brief | 0.75 | 0.25 |
| 5/6/2019 | Review and analyze Credit Union's Answers to Trustee's Discovery Requests and Atty Wenzloff's Brief | 1.00 | 0.50 |
| 5/8/2019 | Prepare and File Motion to Strike and Motion to Compel | 1.50 | 0.50 |
| 5/10/2019 | Review and analyze Credit Union's Motion to Compel Response | 0.50 | 0.25 |
| 5/16/2019 | Prepare for Status Conference | 0.25 | 0.25 |
| 5/17/2019 | Participate in Telephone Status Conference With Court | 0.50 | 0.50 |
| 5/30/2019 | Attend & Participate in Court Hearing | 1.25 | 1.25 |
| 6/7/2019 | Prepare and File Adversary Proceeding against Credit Union | 2.75 | 0.75 |
| 6/10/2019 | Participate in Telephone Status Conference With Court | 0.75 | 0.75 |

| | | | |
|---|---|---|---|
| 6/15/2019 | Review correspondence from Atty Wenzloff | 0.00 | 0.10 |
| 7/9/2019 | Respond to Atty Wenzloff correspondence | 0.00 | 0.50 |
| | Totals | 17.00 | 9.60 |
| | Hourly Rates | $ 300 | $ 490 |
| | Attorney Fees | $5,100 | $4,704 |

Total Attorney Fees      $9,804

<u>Applicable Authorities</u>

28 U.S.C. § 1927 states:

> Counsel's liability for excessive costs

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Federal Rule of Bankruptcy Procedure 9011(b) and (d) state:

Bankruptcy Rule 9011(b) provides:

(b) **Representations to the Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

. . . .

(d) Inapplicability to Discovery. Subdivisions (a) and (c) of this rule do not apply to disclosures and discovery requests, responses, objections, and motions that are subject to the provisions of Rules 7026 and 7037.

Analysis

Rule 9011 Sanctions

Ordinarily, sanctions are appropriate under Bankruptcy Rule 9011 after compliance with the safe harbor requirement of Rule 9011(c)(1). The Trustee did comply with the safe harbor requirement, so at first blush, Rule 9011 sanctions could be appropriate.

The nature of the safe harbor letter, however, detailed the concerns the Trustee had with discovery requests directed to him by Northland. Rule 9011(d), however, prohibits the award of sanctions in discovery disputes. Accordingly, the Court may not award sanctions under Rule 9011 as the issues here relate to compliance with discovery requests.

28 U.S.C. § 1927

Sanctions may still be appropriate under 28 U.S.C. § 1927 regardless of the applicability of Rule 9011. Under 28 U.S.C. § 1927, an attorney is liable solely for excessive costs related to his violative conduct. *Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir. 1997). The bad faith of an attorney is not required, instead the Court may assess fees against an attorney for unreasonable and vexatious multiplication of litigation despite the absence of conscious impropriety. *Jones v. The Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986). As the Sixth Circuit stated in *Jones*:

> An attorney's ethical obligation of zealous advocacy on behalf of his or her client does not amount to *carte blanche* to burden the federal courts by pursuing claims that are frivolous on the merits, or by pursuing nonfrivolous claims through the use of multiplicative litigation tactics that are harassing, dilatory, or otherwise "unreasonable and vexatious." Accordingly, at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims, a trial court does not err by assessing fees attributable to such actions against the attorney.

18

*Id*. at 1230.

In this case, the Court must balance conflicting interests of an attorney who has a duty to represent his client zealously and a duty of candor to the Court. Applied here, the Debtor's motion raised serious issues as to the actions of Northland regarding membership privileges and the impact on the Debtor's Chapter 13 plan. These are serious concerns that have yet to be completely addressed by the parties. As was evident at the March 7, 2019 hearing, however, counsel for Northland diligently looked into the allegations made by the Debtor and concluded that the Debtor was not harmed and stated as such in Court. But the Trustee's counsel added the new issue of possible payments made by the Debtor after the Debtor filed his bankruptcy petition, which are very serious issues as well. Because of these representations, the Court entered an order opening discovery to allow for a full and complete exploration of these facts. Since it was the Trustee's counsel, and not Debtor's counsel, who made these statements on March 7, 2019, Northland was clearly proper in directing discovery to both the Debtor and the Trustee, especially since the Trustee had concurred with the Debtor's motion.

As a result of this discovery, however, the Debtor, by responses to discovery filed with the Court on April 22, 2019, for the first time as near as the Court can determine, disclosed that three payments were made totaling only $198.74. By April 22, 2019, therefore, Northland should have known that only $198.74 was received by it by reviewing its own internal files, as well as receiving confirmation from the Debtor of that amount. This known fact by Northland changed the nature of the discovery requests and that change impacted both Northland and the Trustee. Until April 22, 2019, the Trustee undoubtedly believed the statements made to him supporting the arguments made on March 7, 2019. After that date, those facts were proven to be no longer true and instead a much smaller case, at least from the Trustee's standpoint, existed.

To avoid any further litigation, Northland's counsel should have reached out to the Trustee to try to resolve this matter. That did not happen. Instead, the parties waited until the May 30, 2019 hearing to address issues that could have been addressed informally much earlier.

After the May 30, 2019 hearing, and after direction from the Court, counsel for Northland confirmed the amount at issue and filed a pleading to that effect. The very next day, however, the Trustee filed an adversary proceeding, without bothering to contact counsel for Northland to inquire as to the status of settlement. While the June 6, 2019 letter from Northland's counsel did not include an offer of settlement, the kneejerk filing of an adversary proceeding complaint appears excessive.

Accordingly, the Court concludes that the parties had a genuine good faith dispute that transformed on March 7, 2019 to a much different and larger issue but that the factual predicate for that issue became clear on April 22, 2019. From April 23, 2019 through May 30, 2019, the Court finds that counsel for Northland could and should have reached out to the Trustee's counsel in an attempt to resolve what appeared to be an easily resolvable matter. As the Trustee has retained counsel, the time spent by that attorney should be compensated and the Court concludes that 5.60 hours were incurred by the Trustee's counsel at the rate of $300 per hour totaling $1,680.[2] The Court declines to award any fees and costs to the Trustee himself as his counsel should address any legal issues. The Court will allow, however, compensation to the Trustee at the rate of $300 per hour for being advised of the status of matters by his attorney, as well as appearance at the May 30, 2019 hearing for a total of 2.0 hours at $300 per hour totaling $600.

---

[2] The Court has recalculated the hours on a tenth of an hour basis for the attorney time consistent with E.D. Mich. LBR 2016-1(a)(15)(A)(iv).

The Court has concluded that any fees and costs after June 6, 2019 should not be awarded because the Trustee, much like Northland's counsel, should have reached out to Northland to try to resolve this matter earlier and much more efficiently.

Conclusion

The Court concludes that no sanctions are awarded under Rule 9011 but that costs and attorney fees in the amount of $2,280 are awarded in favor of the Trustee and against Northland. Counsel for the Trustee is directed to prepare an order consistent with this Opinion and the entry of order procedures of this Court.

**Signed on December 9, 2019**

/s/ Daniel S. Opperman

**Daniel S. Opperman**
**United States Bankruptcy Judge**